John Tehranian (SBN 211616)
Email: jtehranian@onellp.com
Peter Afrasiabi (SBN 193336)
Email: pafrasiabi@onellp.com
Jennifer A. Mauri (SBN 276522)
Email: jmauri@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

Attorney for Plaintiff,
HYDE LANE, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HYDE LANE, INC. dba DEMON HUNTER, a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC., a Delaware corporation, NETFLIX STUDIOS, LLC, a Delaware corporation, AEG PRESENTS LLC; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR**<br>**(1) TRADEMARK INFRINGEMENT (15 U.S.C. § 1114);**<br>**(2) FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a));**<br>**(3) STATUTORY UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200); AND**<br>**(4) COMMON LAW UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Hyde Lane, Inc. dba Demon Hunter ("Hyde Lane" or "Plaintiff"), by and through its attorneys, complains against Defendants Netflix, Inc. ("Netflix"), Netflix Studios, LLC ("Netflix Studios") and AEG Presents LLC ("AEG") (collectively, "Defendants") and DOES 1-10, inclusive (collectively, "Defendants"), alleging as follows:

1. This lawsuit is a classic case of massive companies that jealously guard and enforce their own intellectual property rights willfully disregarding the rights of others in pursuit of profits.

2. Defendant Hyde Lane is the corporate entity of Demon Hunter, a well-known and celebrated metal band. Demon Hunter was formed at the turn of the century and, in the quarter-century since, it has consistently released albums, toured, and sold merchandise to a large and dedicated audience. Unfortunately, in 2025, Netflix and Netflix Studios—despite almost certainly being aware of Demon Hunter—chose to release a movie titled *KPop Demon Hunters*. *KPop Demon Hunters* reached unprecedented levels of success, not only as a film on Netflix's streaming service, but also via the *KPop Demon Hunters* movie soundtrack album and merchandise. Even more troublingly, Netflix and Netflix Studios have recently announced their partnership with AEG for the launch of a live *KPop Demon Hunters* global concert tour spanning some 150 cities. In short, in just a year's time, Defendants have taken step after step to move into almost complete overlap with the goods and services offered by Hyde Lane under the DEMON HUNTER mark.

3. As a result of their adoption and exploitation of the *KPop Demon Hunters* brand, which is confusingly similar to senior user Hyde Lane's established DEMON HUNTER mark, junior users Netflix, Netflix Studios, and AEG have created a substantial likelihood of confusion (and, indeed, actual confusion has already resulted), leading consumers to believe the parties' goods or services are affiliated, sponsored, or otherwise connected with one another.

4. The resulting confusion runs both in forward and reverse. Consumers may mistakenly attribute Defendants' goods or services to Hyde Lane, causing Hyde Lane to bear the reputational and commercial consequences of Defendants' conduct and allowing Defendants to divert consumers and appropriate the goodwill that Hyde Lane has built in its DEMON HUNTER marks. At the same time, and even more devastatingly, by leveraging their superior resources and reach, Defendants can, and do, eclipse Hyde Lane's DEMON HUNTER marks in the marketplace and effectively misappropriate the marks' source-identifying significance. Thus, Defendants' greater size and strength overwhelms Hyde Lane's established identity, causing consumers to perceive Hyde Lane as affiliated with, sponsored by, or derived from Defendants and denuding Hyde Lane of power over its commercial fate.

5. The resulting fait accompli constitutes a troubling inversion of trademark priority. Despite having established the mark first and invested in the goodwill associated with it for decades, Hyde Lane—the senior user—has effectively been forced to surrender control over its commercial identity simply because Defendants have greater resources and a larger marketplace footprint. Where, as here, a junior user's adoption of a similar mark creates both the traditional risk that consumers will mistake the junior user for the senior user and the reverse risk that consumers will mistake the senior user for the junior user, the likelihood of confusion—and the resulting injury to the senior user Hyde Lane's trademark rights—is particularly pernicious, leaving Hyde Lane with no choice but to have to seek relief from this Court to restore its rightful interests in its trademarks and the goodwill associated therewith.

## JURISDICTION AND VENUE

6. This is a civil action against Defendants for trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and

statutory and common law unfair competition under California law.

7. This Court has federal question subject matter jurisdiction over this action under the provisions of 15 U.S.C. § 1121 (original jurisdiction over Lanham Act claims), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (jurisdiction to adjudicate claims of federal trademark infringement) because the complaint alleges violations of the federal trademark statutes, and it has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as Plaintiff's claims under the Lanham Act.

8. This Court has personal jurisdiction over Defendants, each of which is doing business in and is headquartered in California/this District.

9. Netflix is registered to do business in the state of California with a principal business address of 121 Albright Way, Los Gatos, CA 95032.

10. Netflix Studios is registered to do business in the state of California with a principal business address of 5808 Sunset Blvd., 11th Floor, Los Angeles, CA 90028.

11. AEG is registered to do business in the state of California with a principal business address of 800 W. Olympic Blvd Ste. 305, Los Angeles, CA 90015.

12. Defendants have each engaged in violations of the Lanham Act and common law and statutory unfair competition in this judicial district. Upon information and belief, Netflix and Netflix Studios have chosen to direct their infringing activities at California, including by advertising and enticing California residents in this district to purchase infringing goods. Upon information and belief, Defendants have chosen to direct their infringing activities at California by advertising the infringing services to California residents, including in this district. Accordingly, and upon information and belief, Defendants derive substantial revenues from commercial activities in California and this district. As a result,

besides Defendants' active and purposeful engagement with, and substantial, continuous and systematic business ties to, California and this District, there is a direct and substantial nexus between Plaintiff's claims in this case and Defendants' purposeful availment of the privilege of conducting activities within California and in this district.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) in that the claim arises in this judicial district, Defendants transact business in this judicial district, the injury suffered by Plaintiffs took place in this judicial district, and a substantial part of the events giving rise to the claim occurred in this district.

14. Defendants are subject to the general and specific personal jurisdiction of this Court because of their contacts with the State of California, as detailed above.

## PARTIES

15. Hyde Lane is a Washington corporation, with its principal place of business in Maple Valley, Washington.

16. Netflix is a Delaware corporation registered to do business in California, with its principal place of business located in Los Gatos, California.

17. Netflix Studios is a Delaware corporation registered to do business in California, with its principal place of business located in Los Angeles, California.

18. AEG is a Delaware corporation registered to do business in California, with its principal place of business located in Los Angeles, California

19. DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint and insert the true names and capacities of said Defendants when the same have been ascertained. Plaintiff is informed and believes, and upon such alleges, that each of the Defendants designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein alleged, and that Plaintiff's damages as alleged herein were proximately caused by such Defendants.

20. Plaintiff is informed and believes, and based thereon alleges, that at all times relevant hereto, each of the Defendants was the agent, alter-ego, servant, or employee of the remaining Defendants, and each was acting within the course and scope of such agency/employment relationship and with the knowledge and consent of the remaining Defendants.

## STATEMENT OF FACTS

### *Plaintiff's Decades Long History as a Popular and Celebrated Band*

21. Hyde Lane is the official corporate entity of the noted American metal band Demon Hunter, and it is the owner of all rights, title and interest in the trademarks of the band, including but not limited to the registered Marks (as defined *infra*).

22. Demon Hunter was formed in Seattle, Washington in 2000 by brothers Ryan Clark and Don Clark. Although Don Clark left the band in 2009, Ryan Clark remains an active member of the band and has served continuously as the band's vocalist, lyricist, primary songwriter, and chief creative force.

23. Mr. Clark's teenage hardcore band signed a record deal when he was just 16, launching a multidisciplinary career in music, the arts and branding that now spans more than three decades, and, over the years, he has overseen Demon Hunter's success as it toured throughout North America, South America, Europe, and Australia while achieving multiple Billboard milestones, including No. 1 albums on the Independent and Christian Albums charts and Top 10 debuts across the Rock, Album Sales, and Current Albums charts.

24. Outside of his career as a musician, Mr. Clark is also a creative director, designer, and brand strategist whose work has helped define brands and visual identities for organizations including NASA, Apple, Amazon, Nike, and Starbucks, and artists including Alice in Chains, Foo Fighters, and Kendrick Lamar, among many others.

/ / /

25. A two-time GRAMMY Award nominee, Mr. Clark is one of the few creatives to build a career at the highest levels of both music and branding, earning a reputation for combining bold creative vision with strategic thinking to help businesses and artists communicate with clarity, authenticity, and lasting impact.

26. As Demon Hunter's frontman, Mr. Clark undertakes writing, recording, performing, touring, merchandising, branding, and creative directing, bringing decades of professional experience to every aspect of his work while remaining committed to producing work that is meaningful, purposeful, and enduring.

27. As a result, under Mr. Clark's careful tutelage, Demon Hunter has, since its formation, become one of the most successful and enduring bands in Christian heavy metal music. Blending metalcore, groove metal, melodic death metal, and alternative metal, Demon Hunter has built a successful career spanning almost a quarter of a century—consistently releasing new albums and touring throughout the U.S. and internationally. During the intervening years, Demon Hunter has shared festival stages with such metal and hard rock luminaries as Ozzy Osbourne, KISS, Foo Fighters, Guns N' Roses, Alice Cooper and others.

28. Demon Hunter's debut single, "Through the Black," was released in February 2002, and its first studio album, *Demon Hunter*, followed later that October. The album received positive reviews and gained attention both within the Christian music industry and the broader metal community.

29. Following the release of its debut album, Demon Hunter embarked on its first national tour.

30. In the years since, Demon Hunter has been prolific in both its recording work and live touring. It has continued to released numerous new albums—including *Summer of Darkness* (2004), *The Triptych* (2005), *Storm the Gates of Hell* (2007), *The Word Is a Thorn* (2010), *True Defiance* (2012), *Extremist* (2014), *Outline* (2017), *War* (2019), *Peace* (2019), *Exile* (2022), and *There Was a*

*Light Here* (2025)—to positive reviews and growing success. For example, *Extremist* debuted at No. 16 on the Billboard 200, becoming the highest-charting album the band had released at the time.

31. In between these full-length album releases featuring new materials, Demon Hunter also released its first live album, *Live in Nashville* (2009), and it documented its Stronger Than Hell Tour in the *45 Days* box set, a 3-disc audio/visual collection that included two DVDs and one CD consisting of full-length documentary, a live concert film, behind-the-scenes footage, and a soundtrack, which was released in 2008.

32. Additionally, Demon Hunter has accompanied its recording and live work with other related projects. For example, the album *Exile* was accompanied by an ambitious multimedia project that included a companion comic book, reflecting founder Ryan Clark's longstanding interest in visual art and storytelling. The Deluxe Edition of *Exile*, a graphic novel (a collection of four issues of the comic books), remains available for purchase today through numerous other retailers under the title "Demon Hunter: Exile – Graphic Novel."

33. Over time, Demon Hunter has continued to tour through North America and, indeed, internationally, playing its own headline shows and major festivals to millions of fans, both from the Christian metal music scene and more mainstream metal audiences.

34. Over its multi-decade history, Demon Hunter has firmly established itself as one of the most iconic and celebrated Christian metal bands of all time. Demon Hunter's consistent output of acclaimed albums, thoughtful artistic evolution, and a carefully curated touring career has earned it a devoted fan base and immense popularity, both in the United States and around the world.

/ / /

/ / /

/ / /

35. For example, on Spotify—the largest streaming music service in the U.S. and the world—Demon Hunter has over 363,000 followers, 348,000 monthly listeners, and its most popular seven songs have a cumulative of over ***one hundred million listens***:




(Screenshot captured on July 28, 2026).

36. As described in the band profile on Spotify: "Demon Hunter is an American metal institution. The band embraces brazenly transcendent melodies without apology, while maintaining a defiant heaviness reminiscent of the most timeless metal. For two decades, Demon Hunter has weathered the changing tides of rock subculture, proving ever resistant to trends and ever resilient, making music as determined and resolute as the men within the band. Demon Hunter's body of work is born of unwavering commitment, uncompromising creative determination, and stark recognition of the reality of an often cold world, tempered by defiant hope. It's made up of smartly constructed, confessional lyrics; heady and catchy melody; monster riffs; bottom-heavy grooves; the collision of meticulous production and urgent raw power; bold imagery and bolder themes. *There Was A*

*Light Here*, the band's 12th album, arrived September 12, 2025." (emphasis added). (Screenshot captured on July 28, 2026).







37. Demon Hunter is not only popular for its recorded music and live performances, but also for its audiovisual content. As described above, the *45 Days* box set included several pieces of audiovisual content. Additionally, Demon

Hunter has a monthly audience of 334,000 on YouTube Music and its YouTube channel features 116 videos, many with millions of views, and it boasts more than 263,000 subscribers:

(Screenshot captured on July 28, 2026).

38. Besides providing live performance services in interstate commerce, since at least as early as 2001, Demon Hunter has also offered for sale, and has sold, a variety of types of merchandise in interstate commerce under the DEMON HUNTER mark, including, but not limited to, vinyl albums, CDs, clothing, and posters, as illustrated in the screenshot from Demon Hunter's online merchandise




store below:

(Screenshot captured on July 28, 2026).

39. In total, over the past quarter-century, Demon Hunter has sold more than one million albums and streaming equivalent albums (SEA) in the United States alone, played more than 300 major concerts, and entertained millions, earning widespread recognition and appreciation of fans throughout the United States (and internationally).

***Plaintiff's Trademarks and Continuous Use Thereof***

40. Hyde Lane is the registered owner of the trademark DEMON HUNTER, registered with the U.S. Trademark and Trademark Office ("USPTO") as Registration No. 6607085, with a registration date of January 4, 2022 in International Class 009 for "Audio recordings featuring music; Digital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and CDs featuring and promoting music; Downloadable audio recordings featuring music; Downloadable musical sound recordings; Musical recordings; Pre-recorded CDs featuring music; Pre-recorded record albums featuring music."

41. Hyde Lane has continuously used its inherently distinctive DEMON HUNTER mark (Reg. No. 6607085), which has also acquired secondary meaning in the marketplace, to distinguish its goods and services from those of others in connection with International Class 009 since at least as early as February 26, 2002, as stated in its issued registration, when DEMON HUNTER was used in connection with the release, sale, licensing, and offering for sale and licensing of the song "Through the Black" in interstate commerce.

42. Hyde Lane is the owner of the trademark DEMON HUNTER, registered with the USPTO as Registration No. 6607086, with a registration date of January 4, 2022, in International Class 016 for "Decals; Stickers; Magnetic bumper stickers; Posters made of paper; Printed tickets; Printed calendars; Printed event programs; Printed photographs; Printed posters; Printed wall calendars; Unmounted printed posters."

/ / /

43. Hyde Lane has continuously used its inherently distinctive DEMON HUNTER mark (Reg. No. 6607086), which has also acquired secondary meaning in the marketplace, to distinguish its goods and services from those of others in connection with International Class 016 since at least as early as March 1, 2001, as stated in its issued registration, when Hyde Lane began selling and offering for sale paper goods and printed matter in connection with the DEMON HUNTER mark in interstate commerce.

44. Hyde Lane is the owner of the trademark DEMON HUNTER, registered with the USPTO as Registration No. 6607087, with a registration date of January 4, 2022, in International Class 025 for "Coats; Dresses; Footwear; Gloves; Headwear; Loungewear; Neckwear; Nightwear; Pants; Scarves; Shirts; Shoes; Shorts; Skirts; Sleepwear; Socks; Sweaters; Underclothes; Belts; Bottoms as clothing; Jackets; Tops as clothing."

45. Hyde Lane has continuously used its inherently distinctive DEMON HUNTER mark (Reg. No. 6607087), which has also acquired secondary meaning in the marketplace, to distinguish its goods and services from those of others in connection with International Class 025 since at least as early as March 1, 2001, as stated in its issued registration, when Hyde Lane began selling and offering for sale clothing in connection with the DEMON HUNTER mark in interstate commerce.

46. Hyde Lane was the registered owner of the trademark DEMON HUNTER, registered with the USPTO as Registration No. 4584097, with a registration date of August 12, 2014, in International Class 041 for "[ Entertainment, namely, live performances by a musical band ]."

47. Hyde Lane has been continuously making use of said inherently distinctive mark, which has also acquired secondary meaning in the marketplace, to distinguish its goods and services from those of others in interstate commerce since at least as early as March 1, 2001, as stated in its previously issued registration, when Hyde Lane began offering entertainment services in connection with the

DEMON HUNTER mark. Registration Number 4584097 was cancelled on February 28, 2025 due to an inadvertent failure to timely file the requisite Section 8 and 9 Declaration.

48. To seek registration of its inadvertently cancelled DEMON HUNTER mark in connection with International Class 041, Hyde Lane filed, and is the owner of, a pending trademark application for DEMON HUNTER, filed with the USPTO as Serial No. 99528509, with a filing date of December 13, 2025 in International Class 041 for “Entertainment services in the nature of live musical performances; Entertainment services in the nature of live vocal performances by musical bands; Entertainment, namely, live performances by a musical band; Conducting of entertainment events in the nature of live musical performances; Entertainment services in the nature of live visual and audio performances by musical bands; Entertainment, namely, live music concerts.” This pending application covers substantially the same or similar services as were registered in connection with Registration No. 4584097.

49. Hyde Lane also owns common law trademark rights in its inherently distinctive DEMON HUNTER mark, which has also acquired secondary meaning in the marketplace, to distinguish its goods and services from those of others in at least the same categories of goods and services as described in Hyde Lane’s registered trademarks and pending trademark application

50. Hyde Lane’s registered and common law trademarks are collectively referred to to herein as the “Marks.”

51. For over a quarter century, Hyde Lane has conducted business using the Marks in interstate commerce. As such, and as described above, Hyde Lane has acquired both federal trademark registrations and common law trademark rights through use of the Marks as a designation of the source and origin of its products and services.

/ / /

52. The Marks have gained significant goodwill and traction in the marketplace and Hyde Lane has invested substantial resources, including decades of tireless dedication and an unwavering commitment to excellence, in developing said goodwill. As such, Hyde Lane has every right to have its valuable and carefully cultivated intellectual property rights respected—especially by multi-billion dollar corporations who are fully aware of the strictures of the law and have no compunction about enforcing their own valuable intellectual property rights against others.

***Defendants' Willful Infringement of the Trademarks***

53. Netflix owns and operates and/or controls the Netflix streaming service of the same name.

54. Netflix also owns and operates and/or controls the Netflix Shop, an online shop where Netflix offers for sale and sells "exclusive officially licensed merchandise inspired by your favorite Netflix stories and characters."

55. On information and belief, Netflix Studios is the production arm of Netflix.

56. Netflix and Netflix Studios have no license or rights to the Marks and were never so licensed or authorized by Hyde Lane for any use of the Marks.

57. In June 2025, Netflix released and distributed a movie on its streaming service titled *KPop Demon Hunters*.

58. *KPop Demon Hunters* follows the actions of a KPop girl band who use their music to protect the world from demons when a rival KPop boy band arrives on the scene and impacts their efforts.

59. KPop is short for Korean Popular Music, a popular genre of music that originated in South Korea and has grown into a global phenomenon. The term "KPop" is therefore a generic word for a particular genre of music, similar to the way the terms rock n' roll, hip-hop, EDM, trap, house, or jazz are the literal names of particular genres of music.

60. Because *KPop Demon Hunters* tells the story of two competing KPop bands, much of its narrative focuses on music and the rival bands' performances of their songs.

61. *KPop Demon Hunters* features nine original songs.

62. On information and belief, around the same time that it released the movie, Netflix released a soundtrack album featuring the songs from the movie. The audio recordings were and are offered for sale, licensing and streaming and were and are sold/licensed/distributed in interstate commerce at least in the form of CDs, downloadable recordings, streaming recordings and vinyl albums.

63. *KPop Demon Hunters* and its soundtrack became massive hits for Netflix.

64. According to Netflix, *KPop Demon Hunters* is "the most-watched Netflix animated original film of all time" and is "Netflix's most popular English-language film ever, with more than 325.1 million views." (https://www.netflix.com/tudum/articles/kpop-demon-hunters-release-date-cast-news).

65. According to Netflix: "KPop Demon Hunters (*Soundtrack from the Netflix Film*), which has scored more than 10 billion global streams to date, is the first soundtrack with four simultaneous Top 10 songs on the Billboard Hot 100. It won the Golden Globe for Best Song and has been nominated for five 2026 Grammy Awards, including Song of the Year for 'Golden,' Best Pop Duo/Group Performance for 'Golden,' Best Compilation Soundtrack for Visual Media, Best Song Written for Visual Media for 'Golden, and Best Remixed Recording for David Guetta's remix of 'Golden.' The film won the 2026 Critics Choice Award for Best Animated Feature and 'Golden' took home the award for Best Song." (https://www.netflix.com/tudum/articles/kpop-demon-hunters-soundtrack).

66. Netflix and Netflix Studios looked to further capitalize on the popularity and success of *KPop Demon Hunters* by selling merchandise under the

KPOP DEMON HUNTERS brand and, more recently, with respect to live performances.

67. Netflix and Netflix Studios have therefore used the KPOP DEMON HUNTERS brand as a trademark, as evidenced by their own attempts to obtain registered trademarks therein. Indeed, since August 2025, Netflix Studio has filed ten applications for registration with the U.S. Patent and Trademark Office for the mark KPOP DEMON HUNTERS in connection with International Classes 003 (Non-medicated cosmetics and toiletry preparations), 009 (recorded and downloadable media, computer software), 020 (furniture and parts therefor), 021 (Household or kitchen utensils and containers), 024 (fabrics and fabric covers for household use), 028 (Games, toys and playthings), and 041 (providing of entertainment; sporting and cultural activities). The earliest use in commerce claimed by Netflix Studios in these applications is June 10, 2025.

68. Netflix and Netflix Studios offer, at a minimum, audio recordings/pre-recorded albums featuring music, paper goods, and clothing, under the KPOP DEMON HUNTERS mark on Netflix's own retail website (the "Netflix Shop"), available at https://www.netflix.shop/collections/kpop-demon-hunters. Screenshots



of the Netflix Shop showing the use of the mark KPOP DEMON HUNTERS in connection with the sale of these goods are below:







(Screenshots captured on July 28, 2026).

69. On information and belief, Netflix Studios licenses and/or otherwise authorizes third parties to use the mark KPOP DEMON HUNTERS in connection with merchandise, including audio recordings, digital media, paper goods, and clothing.

70. By offering for sale and selling at least the above-described merchandise, Netflix and Netflix Studios have expanded their actions to infringe Hyde Lane's Trademark Registration Nos. 6607086 (International Class 016 (paper goods)) and 6607087 (International Class 025 (clothing)), along with its common law marks.

71. Unfortunately, on or around May 13, 2026, Netflix and Netflix Studios—this time in association with AEG—announced their intention to further expand their infringement of Hyde Lane's trademarks by using KPOP DEMON HUNTERS in connection with entertainment services, including live concerts. Specifically, as stated on Netflix's website, "Netflix is teaming up with AEG Presents to launch a KPop Demon Hunters global concert tour, a live experience. . . ." (https://www.netflix.com/tudum/features/kpop-demon-hunters-official-world-tour).

/ / /

/ / /

/ / /

72. On or around May 13, 2026, Defendants published the website https://kpopdemonhunterslive.com/ to market and advertise the upcoming live concerts offered under the mark KPOP DEMON HUNTER. This announcement came on the heels of a surprise live performance at Coachella Valley Music & Arts Festival, owned and operated by Goldenvoice, a subsidiary of AEG Presents, the live entertainment division of AEG Worldwide.




(Screenshot captured on July 28, 2026).

73. Netflix Studios is further attempting to usurp Hyde Lane's trademark rights in DEMON HUNTER in connection with providing live entertainment. On November 7, 2025, Netflix Studios filed an application for trademark registration with the U.S. Patent and Trademark office for KPOP DEMON HUNTERS in

connection with International Class 041 for at least "entertainment events in the nature of organizing cultural and arts events, concerts, galas, dance events, balls, and social entertainment events" and "entertainment services in the nature of live theatrical, musical, and comedic performances. . . . " (Trademark Serial No. 99485888).

74. With the announcement of live concerts and the application for a trademark registration for live entertainment services, Defendants use of KPOP DEMON HUNTERS has moved to an almost complete overlap with Hyde Lane's Marks.

75. Because Hyde Lane was actively using its Marks in interstate commerce since at least 2002 and continuously thereafter, its uses predate all of Netflix and Netflix Studios' uses in commerce of any confusingly similar mark, and thus ***Hyde Lane is the senior user of the Marks by over twenty years***.

76. Accordingly, Netflix and Netflix Studios have engaged in acts that infringe Hyde Lane's trademark Reg. Nos. 6607085, 6607086, and 6607087 along with its common law marks.

77. Defendants' activities have resulted in a likelihood of confusion as well as actual confusion in the marketplace in at least two ways. First, Plaintiff's brand has suffered from so-called forward confusion, at the initial interest, point of sale, and post-sale stages, as Defendants' use of the KPOP DEMON HUNTERS mark has a tendency to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods and services are manufactured, produced, distributed, endorsed, sponsored, approved, affiliated, or connected with Hyde Lane.

78. Second, and perhaps even more fatally, Hyde Lane's brand has also suffered from reverse confusion, at the initial interest, point of sale, and post-sale stages, as Defendants' use has a tendency to cause confusion, deception, and mistake by creating the false and misleading impression that Hyde Lane's goods

and services are manufactured, produced, distributed, endorsed, sponsored, approved, affiliated, or connected with Defendants.

79. The harm to Defendants' conduct is particulary pernicious where, as here, Defendants are massive corporations with millions of dollars to pour into their own brand development (and their own accompanying associations) from Marks that they simply seized from Plaintiff, and thus, consumers are likely to mistakenly believe that Defendants are actually the senior user and that Hyde Lane is potentially an infringer, or that Hyde Lane is affiliated with of sponsored by Defendants.

80. Defendants' wholesale usurpation of Plaintiff's Marks has devastated the ability that Plaintiff previously enjoyed to control its brand and has irredeemably destroyed the associations with the Marks that Plaintiff spent decades establishing, cultivating and further investing in, thereby annihilating Plaintiff's control over its brand identity, goodwill and reputation.

81. To make matters even worse, Defendants' misconduct is unmistakably willful.

82. As one of the largest entertainment/media companies in the world, Netflix is well versed in the strictures of trademark law. Indeed, and among other things, Netflix owns around sixty-nine federally registered trademarks and pending federal trademark registration applications.

83. As the production arm of Netflix, Netflix Studios is similarly well-versed in the strictures of trademark law as Netflix. On information and belief, Netflix Studios owns around two hundred and sixty-seven federally registered trademarks and pending federal trademark registration applications.

84. Yet further, Netflix and Netflix Studios actively enforce their own purported trademark rights—further confirming their knowledge of the strictures of trademark law and the need to obtain licenses prior to using a trademark that Netflix or Netflix Studios do not own. Indeed, Netflix and Netflix Studios recently filed suit

in the United States District Court for the Northern District of Illinois, Eastern Division, *Netflix, Inc et al. v. The Partnerships and Unincorporated Associations Identified on Schedule "A,"* Case No. 26-cv-04705 (filed April 28, 2026), claiming infringement of its trademarks, including its purported KPOP DEMON HUNTERS marks.

85. Furthermore, on information and belief, Netflix and Netflix Studios were aware of Hyde Lane's rights in the Marks and chose to disregard those rights in favor of capitalizing on the success of the KPop Demon Hunters movie to sell merchandise and increase Netflix and Netflix Studio's profits, and they were aware of Hyde Lane's rights in the Marks and actively chose to disregard those rights in favor of capitalizing on the success of the KPop Demon Hunters movie by announcing live concerts which are intended to generate further revenue and profits for Defendants. After all, among other things, (1) Hyde Lane's Marks have been registered with the United States Patent and Trademark Office for many years, putting Netflix both on constructive notice of Hyde Lane's rights and Marks; (2) Netflix and Netflix Studios and their respective counsel undoubtedly came across (or should have come across) the registered DEMON HUNTER Marks when performing even the most cursory search of the USPTO Trademark Database when preparing to file their own portfolio of trademark applications in connection with KPOP DEMON HUNTERS; and (3) on information and belief, Netflix and/or Netflix Studios have engaged in a strategy of filing trademark registration applications that are carefully worded to attempt to skirt detection by the USPTO with respect to Hyde Lane's registered marks.

86. For example, Netflix Studios' registration KPOP DEMON HUNTERS in International Class 009 is for "Decorative magnets; Protective sleeves for laptop computers; Mouse pads; Protective cases for mobile phones." In comparison, Hyde Lane's registration in International Class 009 is for "Audio recordings featuring music; Digital media, namely, pre-recorded DVDs, downloadable audio and video

recordings, and CDs featuring and promoting music; Downloadable audio recordings featuring music; Downloadable musical sound recordings; Musical recordings; Pre-recorded CDs featuring music; Pre-recorded record albums featuring music." Yet, KPOP DEMON HUNTERS is most well-known by the public as being "digital media" (a movie on the Netflix streaming platform) and "audio recordings featuring music" (the soundtrack and songs from the soundtrack). But, quite curiously, and despite continuing to engage in interstate commerce making trademark use of KPOP DEMON HUNTERS in digital media and audio recordings featuring music, Netflix Studios did not identify those particular goods in their registration; instead, it filed a registration that excluded any mention of some of the goods for which the KPOP DEMON HUNTER brand is best known.

87. Similarly, despite Netflix and Netflix Studios continuing to engage in interstate commerce making trademark use of KPOP DEMON HUNTER in connection with the sale of numerous paper goods such as stickers, decals, posters, and hundreds of different varieties of clothing such as t-shirts and sweatshirts, and thereby actively infringing Plaintiff's Marks, Netflix Studios unusually did not identify those specific goods in its trademark applications. This careful crafting of their filed registrations appears uniquely designed to evade USPTO detection of their likelihood of confusion with Plaintiff's Marks.

88. These machinations further evidence awareness of Hyde Lane's registrations and willfulness as, by not naming the exact goods identified in Plaintiff's long-extant registrations, Netflix and Netflix Studios sought to avoid scrutiny by the USPTO, which would have identified Plaintiff's registrations and, consequently, denied their applications on the grounds that they would create a likelihood of confusion therewith.

89. For a multi-billion company with an army of in-house lawyers and outside counsel deeply steeped in the niceties of intellectual property law and licensing requirements to adopt such a tack plainly evinces willful disregard for the

rights of others, oppression and malice.

90. The activities complained of herein have and continue to irreparably harm Hyde Lane and devastate its ability to control the goodwill and associations with its Marks. Further, Defendants' egregious conduct makes this an exceptional case.

***KPOP DEMON HUNTERS Is Confusingly Similar to DEMON HUNTER***

91. KPOP DEMON HUNTERS is confusingly similar to DEMON HUNTER.

92. KPOP DEMON HUNTERS subsumes the entire DEMON HUNTER mark.

93. The inclusion of KPOP before the words DEMON HUNTERS does not overcome the likelihood of confusion because KPOP is a generic or, at best, merely descriptive term—a conclusion the U.S. Patent and Trademark Office already made. Indeed, on March 16, 2026, the trademark examiner refused Netflix Studios' application for trademark registration for KPOP DEMON HUNTERS in International Class 041 because the term KPOP "is merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services." In response, on June 3, 2026, Netflix Studios attempted to argue that "Consumers understand 'KPOP'" as being a part of the whole and indivisible unitary mark, KPOP DEMON HUNTERS, which identifies the title of a famous animated film, and the mark functions as an incongruous and unique indication of source." However, on July 20, 2026, the trademark examiner again refused Netflix Studios' application, explaining that "'KPOP' and 'DEMON HUNTERS' merely aggregate descriptions of the characters but do not actually modify each other in meaning" and that "the meaning of 'KPOP] retains its general dictionary-based and acronym-based meaning and merely acts as a descriptor of 'DEMON HUNTERS.'" But, the trademark examiner provided a way forward for Netflix Studios: "Applicant may respond to this issue by submitting a disclaimer in

the following format: No claim is made to the exclusive right to use 'KPOP' apart from the mark as shown." In short, the U.S. Patent and Trademark Office has already confirmed that the term KPOP merely describes a feature or characteristic of DEMON HUNTERS and thus, the potentially registerable and thus, protectable portion of KPOP DEMON HUNTERS is DEMON HUNTERS.

94. Simply put, Netflix is no more entitled to use the mark KPOP DEMON HUNTERS than it would be to launch a recording artist, live touring show and merchandise under the marks KPOP METALLICA, KPOP U2 or KPOP BLACK SABBATH.

95. Not only are the terms KPOP DEMON HUNTERS and DEMON HUNTER plainly confusingly similar, the services have nearly complete overlap. DEMON HUNTER has a long history of use of its Marks in interstate commerce in connection with goods and services that fall within International Class 009 (Reg. No. 6607085), International Class 016 (Reg. No. 6607086), International Class 025 (Reg. No. 6607087), and International Class 041 (Ser. No. 99528509). As set forth above, Defendants are using KPOP DEMON HUNTERS in connection with literally the same goods and services.

96. Because of the overlap in the goods and services, and the strong similarity between KPOP DEMON HUNTERS and DEMON HUNTER, consumers are likely to be confused regarding the origin, sponsorship, or affiliation of the goods and services.

***Defendants Activities Have Already Caused Actual Confusion***

97. Moreover, although no evidence of actual confusion is necessary for a finding of trademark infringement or false designation of origin, unfortunately, Defendants' actions have already resulted in numerous instances of actual consumer confusion.

98. For example, on February 26, 2026, Hyde Lane received an email requesting a ticket refund based on that person purchasing tickets to a Demon

Hunter concert after being confused and thinking that they were purchasing tickets to a KPop Demon Hunter concert:

> "Hi Demon Hunter, I just purchased tickets to your show in Albany NY for May 2, 2026 and after I accepted the tickets I realized that you guys are not "K Pop demon hunters" and that my 5 and 6yr old girls will probably not fit in well at your concert. I thought I was purchasing tickets to a child friendly concet [sic]. I was way to [sic] excited and didn't pay attention. I spent almost $500 on the tickets because I wanted my girls to have a great view their very first concert and I really messed up. Is their [sic] anyway to refund me or get me a credit or something. If I dont get it refunded I will not be able to purchase tickets to the actual "K pop demon hunters show". Please help! Thanks for your time.

99. On or around March 16, 2026, a producer from the television show Inside Edition emailed Ryan J. Downey,[1] the manager of Demon Hunter, to request an interview with "songwriter Yu-Han Lee" to "speak with him about winning the prestigious [Oscar] award." Yu-Han Lee is not associated with Demon Hunter or Hyde Lane, but he is the songwriter for KPop Demon Hunters that won an Oscar on March 15, 2026, in connection with KPop Demon Hunter.

/ / /

/ / /

---

[1] Mr. Downey has spent nearly three decades building a career at the intersection of storytelling and pop culture as a writer, producer, talent manager, author, creative consultant, and moderator across music, film, television, publishing, and live events. He has over interviewed over 100 other artists and cultural figures, contributed to, produced, written and/or hosted content for numerous publications media outlets, and studios, including Billboard, the GRAMMYs, Sony, Warner Bros., Z2, and MTV News. He hosts the MI Conversation Series at Musicians Institute in Hollywood and is a regular moderator at San Diego Comic-Con and other pop culture events. Mr. Downey also founded Superhero Artist Management, home to numerous well-known clients, including Demon Hunter.

100. Numerous posts on social media such as Instagram incorrectly tag DEMON HUNTER (#demonhunter) in connection with KPOP DEMON HUNTERS content:







/ / /

/ / /

/ / /

101. In addition to consumer confusion, as KPOP DEMON HUNTERS grew in popularity, it has overwhelmed DEMON HUNTER in search results. For example, a recent search for event tickets on Ticketmaster for "Demon Hunter" prioritized three KPOP DEMON HUNTERS related events over DEMON HUNTER:




/ / /

/ / /

/ / /

102. In another example, a Google search for "demon hunter" in 2024 provided 50 million results and the front page of results was dominated by DEMON HUNTER. However, in 2026, a search for "demon hunter" provides 357 million results and the front page is a mix of DEMON HUNTER and KPOP DEMON HUNTER:




/ / /

/ / /

/ / /

103. In yet another example that showcases the likelihood that consumers will be confused as to the source or affiliation between the Marks and KPOP DEMON HUNTERS is the proliferation online of heavy metal cover versions of the songs from the KPOP DEMON HUNTERS movie and soundtrack album. Since Demon Hunter is a band playing in the heavy metal genre, metal cover versions of the KPOP DEMON HUNTERS songs are especially likely to cause consumers to believe that Hyde Lane and Defendants are affiliated. Below are screenshots of two different public playlists on Spotify, each of which are made up of metal covers:

/ / /

/ / /

/ / /


KPOP DEMON HUNTERS METAL
Public Playlist
KPop Demon Hunters METAL COVERS
We sealing the Honmoon with this one // Art by Jiunn Kuo on ArtStation (DO NOT USE/TRAIN THE COVER ART ON AI, its disrespectful a...
ST☆R • 13,626 saves • 34 songs, 1 hr 47 min
Custom order
# Title Album Date added
1 Your Idol Andrew Baena, Johnny Ciardullo Your Idol Jul 20, 2025 3:12
2 How It's Done Andrew Baena, Lauren Babic, Phasestep How It's Done Jul 27, 2025 2:54
3 Takedown Andrew Baena, Jessie Grace, Phasestep Takedown Aug 22, 2025 3:00
4 Your Idol SINS Your Idol Jul 28, 2025 3:40
5 What It Sounds Like SINS What It Sounds Like Jul 28, 2025 4:27
6 Golden SINS Golden Jul 28, 2025 3:16


K-POP DEMON HUNTERS METAL
Public Playlist
KPop Demon Hunters METAL/ROCK COVERS
🤍mailliW🤍 • 2,003 saves • 65 songs, 3 hr 37 min
Recently added
# Title Album Date added
1 What It Sounds Like (Metal Version) Jonathan Young KPop Demon Hunters Meets Metal Apr 30, 2026 3:59
2 How It's Done - Rock Version Kenshi, Kim X, Gogy RDH Collection Jan 1, 2026 3:08
3 Soda Pop - Almost METAL Ver. Almost Metal Soda Pop (Almost METAL Ver.) Jan 1, 2026 3:19
4 Your Idol - Almost METAL Ver. Almost Metal Your Idol (Almost METAL Ver.) Jan 1, 2026 4:02
5 GOLDEN KAYLA KING, Mia Asano GOLDEN Nov 14, 2025 3:11
6 Your Idol - Japanese Version Shayne Orok, Curserino Your Idol (Japanese Version) Nov 5, 2025 3:07

(Screenshots captured Aug. 8, 2026). Additionally, metal covers of the KPOP DEMON HUNTERS songs are popular on youtube.com[2] with numerous videos generating millions of views, as well as other social media such as TikTok and Instagram:







(Screenshots captured Aug. 8, 2026).

104. One of the consequences of the increase of KPOP DEMON HUNTERS related information and content online is that it has become increasingly difficult for consumers looking for DEMON HUNTER to find relevant information and purchase DEMON HUNTER goods and services.

---

[2] "YOUR IDOL (K-Pop Demon Hunters) || Saja Boys Metal Cover by @jonathanymusic" (https://www.youtube.com/watch?v=dRyW5QFknKI&list=RDdRyW5QFknKI&start_radio=1) (2.3 million views);
"'How It's Done' Metal Version | K-Pop Demon Hunters (available at https://www.youtube.com/watch?v=EjL-qHZhaNo&list=RDEjL-qHZhaNo&start_radio=1) (1.4 million views);
GOLDEN - K-POP Demon Hunters Goes METAL (ft. @marinalatorracaofficial & @wearetulip) HUNTRIX COVER") (https://www.youtube.com/watch?v=7oj90Eare4c&list=RD7oj90Eare4c&start_radio=1_ (722,000 views).

105. Ultimately, as the senior user of DEMON HUNTER with over twenty-five years of history, hard work, effort, and investment into the DEMON HUNTER brand, Hyde Lane should be able to continue operating under the name it established without substantial confusion among consumers seeking the band's music, live performances, merchandise, and related activities. But, due to Defendants' wrongful actions, Demon Hunter's established identity is becoming increasingly obscured within recorded music, live touring and merchandise-related channels due to overlapping use by the KPOP DEMON HUNTERS brand.

106. As a result of Defendants' willful misconduct, the DEMON HUNTER Marks and the brand that Hyde Lane has carefully built over the course of the past quarter century now faces an existential crisis, thereby necessitating the filing of this action and the granting of the requested relief from this Court.

## FIRST CAUSE OF ACTION

**(Trademark Infringement, 15 U.S.C. § 1114)**

**(By Plaintiff against Netflix and Netflix Studios)**

107. Plaintiff hereby incorporates by reference and realleged the allegations in all previous paragraphs as though fully set forth herein.

108. Hyde Lane owns valid and protectable rights in the federally registered DEMON HUNTER Marks, which Hyde Lane has continuously used since the date of first use as designated in their respective trademark registrations.

109. The use by Netflix and Netflix Studios of confusingly similar imitations of the federally registered Marks constitutes infringement of Plaintiff's federally registered Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, as the actions of Netflix and Netflix Studios are likely to cause forward and/or reverse confusion, or to cause mistake, or to deceive consumers as to an affiliation, connection, or association between Hyde Lane and Defendants Netflix and Netflix Studios, or as to the origin, sponsorship, or approval of the goods or services of Netflix and/or Netflix Studios by Hyde Lane. The use by Netflix and

Netflix Studios has a tendency to deceive or confuse consumers into believing that products and/or services of Netflix and Netflix Studios are affiliated with Hyde Lane, are sponsored or approved of by Hyde Lane, or otherwise associated with or authorized by Hyde Lane, and/or that Hyde Lane's products and/or services are associated with Netflix and/or Netflix Studios, are sponsored or approved of by Netflix and/r Netflix Studios, or otherwise associated with or authorized by Netflix and/or Netflix Studios.

110. Netflix and Netflix Studios have further knowingly encouraged, induced, materially contributed to, and/or facilitated the infringement of Plaintiff's federally registered DEMON HUNTER Marks and they have the right and ability to stop or limit the infringement and a direct financial interest in such infringing activities.

111. As a consequence of the acts described above, Netflix and Netflix Studios have directly, contributorily or vicariously infringed and are directly, contributorily or vicariously infringing Hyde Lane's trademark rights in the federal registered DEMON HUNTER Marks.

112. At no time did Defendants have authorization, legal rights, or consent to engage in such activities in disregard of Plaintiff's rights in the federally registered DEMON HUNTER Marks.

113. Hyde Lane is informed and believes and thereon alleges that as a proximate result of the unfair advantage accruing to Defendant Netflix and Netflix Studios' business from deceptively trading on Hyde Lane's federally registered Marks in advertising, sales, and consumer recognition, Hyde Lane has been damaged and deprived of substantial sales and has been deprived of the value of its federally registered Marks as a commercial asset, in amounts to be established according to proof.

/ / /

114. Netflix and Netflix Studios' unauthorized use and promotion of the federally registered DEMON HUNTER Marks are causing confusion, and will likely continue to cause confusion, mistake, or deception on the part of consumers as to the source, nature, and quality of the good and services Netflix and Netflix Studios are offering, constituting trademark infringement in violation of 15 U.S.C. § 1114.

115. By reason of the existence of an actual and justiciable controversy, Hyde Lane is entitled to a finding of infringement that Netflix's activities infringe Hyde Lane's federally registered Marks in violation Section 32 of the Lanham Act, 15 U.S.C. § 1114.

116. Hyde Lane is informed and believes, and thereon alleges that, unless restrained by the Court, Netflix and Netflix Studios will continue to infringe the federally registered Marks, thus engendering a multiplicity of judicial proceedings, and that pecuniary compensation will not afford Hyde Lane adequate relief for the damage to its federally registered Marks in the public perception. Further, Hyde Lane is informed and believes and thereon alleges that in the absence of injunctive relief, customers are likely to continue to be mistaken or deceived as to the true source, origin sponsorship, and affiliation of Hyde Lane with Netflix and Netflix Studios.

117. As a direct and proximate result of Netflix and Netflix Studios' wrongful conduct, Hyde Lane has been, is now, and will be irreparably injured and damaged by Netflix and Netflix Studios' aforementioned acts, and unless Netflix and Netflix Studios are enjoined by the Court, Hyde Lane will suffer further harm to its name, reputation, and goodwill. This harm constitutes an injury for which Hyde Lane has no adequate remedy at law.

118. At a minimum, Hyde Lane is entitled to injunctive relief and to recover Netflix and Netflix Studios' profits, whichever is greater, together with Hyde Lane's attorneys' fees pursuant to 15 U.S.C. § 1117. In addition, pursuant to 15

U.S.C. § 1118, Hyde Lane is entitled to an order requiring destruction of all infringing materials in Netflix or Netflix Studios' possession.

119. On information and belief, Netflix and Netflix Studios had actual knowledge of Hyde Lane's ownership and use of the federally registered DEMON HUNTER Marks prior to Netflix and Netflix Studios' adoption and use of confusingly similar variations of the federal registered Marks in connection with the promotion and sale of its products and services.

120. On information and belief, Netflix and Netflix Studios have acted deliberately, intentionally, and willfully to usurp Hyde Lane's rights, and should be held liable for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a), and Netflix and Netflix Studios' profits due to the infringement.

## SECOND CAUSE OF ACTION

**(False Designation of Origin, 15 U.S.C. § 1125(a)(1)(A))**

**(By Plaintiff against Defendants)**

121. Plaintiff hereby incorporates by reference and realleged the allegations in all previous paragraphs as though fully set forth herein.

122. In addition to its federal trademark registrations, Hyde Lane owns and enjoys valid, enforceable and fully subsisting common law trademark rights in the DEMON HUNTER Marks in California and throughout the United States.

123. Specifically, Defendants' use confusingly similar imitations of the DEMON HUNTER Marks in interstate commerce constitutes false designations of origin, as it is likely to cause forward and/or reverse confusion, or to cause mistake, or to deceive consumers as to an affiliation, connection, or association between Hyde Lane and Defendants, or as to the origin, sponsorship, or approval of Defendants' goods or services by Hyde Lane. Defendant's use has a tendency to deceive or confuse consumers into believing that Defendants' products and/or services are affiliated with Hyde Lane, are sponsored or approved of by Hyde Lane, or otherwise associated with or authorized by Hyde Lane, and/or that Hyde Lane's

products and/or services are associated with Defendants, are sponsored or approved of by Defendants, or otherwise associated with or authorized by Defendants.

124. Defendants have further knowingly encouraged, induced, materially contributed to, and/or facilitated the infringement of Plaintiff's Marks and they have the right and ability to stop or limit the infringement and a direct financial interest in such infringing activities.

125. As such, the acts of Defendants described above have directly, contributorily or vicariously infringed and are directly, contributorily or vicariously infringing Plaintiff's Marks and rights therein.

126. At no time did Defendants have authorization, legal rights, or consent to engage in such activities in disregard of Hyde Lane's rights in the Marks.

127. By engaging in the activities described above, Defendants have made and are making false, deceptive and misleading statements constituting unfair competition, false representations, false designation of origin and false advertising made in connection with services distributed in interstate commerce in violation, directly, contributorily or vicariously, of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

128. As a proximate result of Defendants' advertising, promotion, sale, offering for sale, and distribution of these goods and services, Hyde Lane has been damaged and deprived of sales and will continue to be deprived of sales of genuine Hyde Lane goods and services.

129. As a proximate result of Defendants' actions, Hyde Lane has been deprived and will continue to be deprived of the value of its Marks as a commercial asset.

130. Indeed, the advertising, promotion, sale, offering for sale, and distribution by Defendants of these infringing goods and services is likely to cause forward and/or reverse confusion and mistake and to deceive purchasers and does in fact cause forward and/or reverse confusion, mistake, and deception.

131. In addition, as a proximate result of the unfair advantage accruing to Defendants' businesses from deceptively trading on Hyde Lane's Marks and its goodwill and consumer recognition, Defendants have made substantial sales and profits in amounts to be established according to proof.

132. Defendants' acts have caused and, unless restrained by this Court, will continue to cause Hyde Lane and the public to suffer great and irreparable damage, for which no adequate remedy at law exists, and injury through, *inter alia*: (a) a likelihood of forward and/or reverse confusion, mistake, and deception among the relevant purchasing public as to the true source, origin, sponsorship, and affiliation of the Defendants' infringing goods and/or services and Hyde Lane's goods and/or services associated with the Marks; and (b) the loss of Hyde Lane's valuable goodwill and business reputation symbolized by its Marks.

133. Defendants' acts are causing great and irreparable injury to Hyde Lane and its Marks and to the products and goodwill represented thereby, in an amount that cannot be ascertained at this time and, unless restrained, will cause further irreparable injury, leaving Hyde Lane with no adequate remedy at law.

134. By reason of the foregoing, Hyde Lane is entitled to injunctive relief against Defendants, restraining further acts of unfair competition, false designation of origin and false advertising, and to recover attorneys' fees and any damages proven to have been caused by reason of Defendants' aforesaid acts of false designation of origin.

135. On information and belief, Defendants' actions complained of herein were deliberate, intentional and willful, and Defendants knew or should have known that its acts were and are wrongful and that they distributed and sold infringing goods and services marketed in connection with KPOP DEMON HUNTERS that infringe on Hyde Lane's Marks. In the process, Defendants acted in reckless disregard of Plaintiff's intellectual property rights.

/ / /

136. On information and belief, Hyde Lane alleges that Defendants' acts were committed, and continue to be committed, with actual notice of Hyde Lane's exclusive rights and with an intent to cause confusion, to cause mistake, and/or to deceive, and to cause injury to the reputation and goodwill associated with Hyde Lane and its goods and services. Pursuant to 15 U.S.C. § 1117, Hyde Lane is, therefore, entitled to recover three times its actual damages or three times Defendants' profits, whichever is greater, together with Hyde Lane's attorneys' fees, and Hyde Lane may elect, at time of trial and in the alternative, statutory damages up to the maximum extent permitted under the Lanham Act.

137. In addition, pursuant to 15 U.S.C. § 1118, Hyde Lane is entitled to an order requiring destruction of all infringing materials in Defendants' possession.

## THIRD CAUSE OF ACTION

**(California Statutory Unfair Competition, Cal. Bus. & Prof. Code § 17200)**

**(By Plaintiff against Defendants)**

138. Plaintiff hereby incorporates by reference and realleged the allegations in all previous paragraphs as though fully set forth herein.

139. Defendants' conduct constitutes unlawful, unfair and fraudulent business practices and unfair competition in violation of California common law due to the unlawful acts outlined above, which includes but is not limited to the Lanham Act violations as outlined above.

140. Because Defendants violated Plaintiff's interest in the Marks, Defendants engaged in unlawful business practices in direct, contributory and/or vicarious violation of § 17200 of California's Business & Professions Code.

141. By using the Marks without consent or permission, Defendants gained an unfair business advantage by conferring upon themselves the benefits of the goodwill Plaintiff fostered over years of brand development.

142. These actions also fundamentally undermine the value of Plaintiff's trademarks as a business asset.

143. Plaintiff is therefore entitled to appropriate damages according to proof, including but not limited to restitution, and appropriate injunctive relief to protect against any ongoing and further injury caused by Defendant's unlawful and unfair business practices.

**<u>FOURTH CAUSE OF ACTION</u>**

**(Common Law Unfair Competition)**

**(By Plaintiff against Defendants)**

144. Plaintiff hereby incorporates by reference and realleged the allegations in all previous paragraphs as though fully set forth herein.

145. Hyde Lane owns and enjoys valid, enforceable and fully subsisting common law trademark rights in the DEMON HUNTER Marks in California and throughout the United States.

146. By using the Marks without consent or permission, Defendants gained an unfair business advantage by conferring upon themselves the benefits of the goodwill Hyde Lane fostered over years of brand development.

147. Defendants' unlawful actions also fundamentally undermine the value of Hyde Lane's Marks as a business asset.

148. Defendants, through the conduct and violations described above, have engaged in, engage in and continue to engage in unfair competition under California common law. As a consequence of Defendants' violations, Hyde Lane is entitled to relief as set forth below.

149. The acts of Defendants complained of herein constitute acts of unfair competition against Plaintiff under the common law of the state of California, which acts have been committed knowingly and willfully and have injured Plaintiffs in their trade and business.

150. By the acts and activities of Defendants complained of herein, Defendants have been unjustly enriched.

/ / /

151. As a direct and proximate result of the acts and activities of Defendants complained of herein, Plaintiffs have been damaged in an amount not yet ascertainable.

152. Hyde Lane is therefore entitled to appropriate damages according to proof and appropriate injunctive relief to protect against any ongoing and further injury caused by Defendants' unlawful and unfair business practices.

153. Plaintiffs are informed and believe, and based thereon allege, that Defendants, in doing the things herein alleged, acted willfully, maliciously, and oppressively, with full knowledge of the adverse effect of their actions on Plaintiffs, and with willful and deliberate disregard for the consequences to Plaintiffs, and should be held liable for exemplary damages pursuant to California Civil Code Section 3294.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

154. Preliminarily and permanently enjoining Netflix and Netflix Studios, and all persons in active concert or participation with them, from directly or indirectly using the KPOP DEMON HUNTERS Mark, or any other mark, word, or name incorporating or confusingly similar to Hyde Lane's DEMON HUNTER Marks, in connection with the same or related goods or services as: Audio recordings featuring music; Digital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and CDs featuring and promoting music; Downloadable audio recordings featuring music; Downloadable musical sound recordings; Musical recordings; Pre-recorded CDs featuring music; Pre-recorded record albums featuring music.

155. Preliminarily and permanently enjoining Netflix and Netflix Studios, and all persons in active concert or participation with them, from directly or indirectly using the KPOP DEMON HUNTERS Mark, or any other mark, word, or name incorporating or confusingly similar to Hyde Lane's DEMON HUNTER

Marks, in connection with the same or related goods or services as: Decals; Stickers; Magnetic bumper stickers; Posters made of paper; Printed tickets; Printed calendars; Printed event programs; Printed photographs; Printed posters; Printed wall calendars; Unmounted printed posters.

156. Preliminarily and permanently enjoining Netflix and Netflix Studios, and all persons in active concert or participation with them, from directly or indirectly using the KPOP DEMON HUNTERS Mark, or any other mark, word, or name incorporating or confusingly similar to Hyde Lane's DEMON HUNTER Marks, in connection with the same or related goods or services as: Coats; Dresses; Footwear; Gloves; Headwear; Loungewear; Neckwear; Nightwear; Pants; Scarves; Shirts; Shoes; Shorts; Skirts; Sleepwear; Socks; Sweaters; Underclothes; Belts; Bottoms as clothing; Jackets; Tops as clothing.

157. Preliminarily and permanently enjoining Defendants, and all persons in active concert or participation with them, from directly or indirectly using the KPOP DEMON HUNTERS Mark, or any other mark, word, or name incorporating or confusingly similar to Hyde Lane's DEMON HUNTER Marks, in connection with the same or related goods or services as: entertainment services in the nature of live musical performances; Entertainment services in the nature of live vocal performances by musical bands; Entertainment, namely, live performances by a musical band; Conducting of entertainment events in the nature of live musical performances; Entertainment services in the nature of live visual and audio performances by musical bands; Entertainment, namely, live music concerts.

158. Issuing and entering a seizure order directing the U.S. Marshall to seize and impound all items possessed, owned or under the control of Defendants, their officers, agents, servants, employees, representatives and attorneys, and all persons in active concert or participation with them, which infringe upon Plaintiff's trademark and unfairly compete with Hyde Lane, including but not limited to any and all products bearing the infringing marks.

159. Issuing and entering an order directing the Commissioner of Trademarks to abandon with prejudice or cancel, as relevant, Defendants pending applications or registrations for purported marks that infringe Plaintiff's rights;

160. Awarding Hyde Lane its actual damages suffered as a result of Defendants' unlawful conduct, in an amount to be proven at trial.

161. Awarding reasonable funds for future corrective advertising to remediate Defendants' unlawful conduct.

162. Awarding disgorgement to Plaintiff of all gains, profits, property and advantages derived by Defendants from their unlawful conduct and an accounting of said gains, profits, property and advantages pursuant, inter alia, to 15 U.S.C. § 1117.

163. Awarding Hyde Lane a trebling of any damages awarded, pursuant to 15 U.S.C. § 1117.

164. Awarding restitution in an amount to be proven at trial under, inter alia, California's statutory unfair competition law

165. Awarding damages in an amount to be proven at trial for unjust enrichment under California's common law unfair competition law.

166. Awarding exemplary and punitive damages to deter any further willful misconduct for common law unfair competition and as otherwise allowed by law

167. Awarding Hyde Lane its costs of suit, attorney's fees, and reasonable expenses in this exceptional case.

168. Awarding pre-and post-judgment interest at the maximum rate allowable by the law.

/ / /

/ / /

/ / /

169. Granting such other relief as the Court may deem just and equitable.

Dated: August 18, 2026 **ONE LLP**

By: /s/ John Tehranian
John Tehranian
Peter Afrasiabi
Jennifer A. Mauri
Attorneys for Plaintiff,
Hyde Lane, Inc.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims and all issues properly triable thereby.

Dated: August 18, 2026 **ONE LLP**

By: /s/ John Tehranian
John Tehranian
Peter Afrasiabi
Jennifer A. Mauri
Attorneys for Plaintiff Hyde Lane, Inc.